**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RICOH COMPANY, LTD., | |
| Plaintiff, | C.A. No. _____ |
| v. | |
| ZOOM COMMUNICATIONS, INC. F/K/A ZOOM VIDEO COMMUNICATIONS, INC., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Ricoh Company, Ltd. ("Plaintiff" or "Ricoh") brings this action for patent infringement against Defendant Zoom Communications, Inc. f/k/a Zoom Video Communications, Inc. ("Defendant" or "Zoom"), and alleges as follows:

**THE PARTIES**

1.      Ricoh Company, Ltd. is a corporation organized and existing under the laws of Japan, with its principal place of business in Tokyo, Japan.

2.      Defendant Zoom Communications, Inc. f/k/a Zoom Video Communications, Inc. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business in San Jose, California. Zoom is registered to conduct business in the State of Delaware and has appointed The Corporation Trust Company, located in Wilmington, Delaware, as its agent for service of process.

3.      Zoom is a multinational information technology company that develops and provides cloud-based communication and collaboration products and services, including video conferencing, whiteboards, and messaging systems. Zoom sells and provides its products and services to customers, users, and manufacturers around the world, including to customers, users, and manufacturers in this District.

- 1 -

4.     Zoom operates and owns the Zoom.com and Support.Zoom.com websites, through which it markets, offers, distributes, and provides technical support for its cloud-based communication and collaboration products and services, including video conferencing, whiteboards, and messaging systems, throughout the United States including in this District.

5.     Zoom places, has placed, and/or contributed to placing the products and/or services accused of infringement throughout this Complaint into the stream of commerce via an established distribution channel knowing or understanding that such products and/or services would be sold in the United States, including in this District. Zoom has also derived substantial revenues from infringing acts in this District, including from the sale of such products and/or services.

6.     Zoom is engaged in making, using, selling, offering for sale, and/or importing, and/or inducing its subsidiaries, affiliates, retail partners, and customers in the making, using, selling, offering for sale, and/or importing throughout the United States, including within this District, the products and services accused of infringement throughout this Complaint, such as cloud-based communication and collaboration products and services, including video conferencing, whiteboards, and messaging systems.

7.     Through offers to sell, sales, imports, distributions, and other related agreements to transfer ownership of Zoom's products and/or services accused of infringement throughout this Complaint Zoom does business in the United States, the State of Delaware, and in this District.

## JURISDICTION AND VENUE

8.     This is a civil action against Zoom for patent infringement under the United States patent laws, as amended, 35 U.S.C. §§ 101 *et seq.* (the "Patent Laws"). This action arises out of Zoom's making, using, selling, offering for sell, and/or importing into the United States certain products and services covered by Ricoh's patents identified in this Complaint and/or inducing or contributing to its subsidiaries, affiliates, retail partners, and customers' direct infringement of

those Ricoh's patents. Accordingly, Ricoh seeks monetary and injunctive relief under the Patent Laws.

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.

10.     This Court has personal jurisdiction over Zoom because Zoom is organized and exists under the laws of Delaware, Zoom has engaged in continuous, systematic, and substantial business in Delaware, and Zoom has committed and continues to commit, acts of patent infringement in Delaware.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b) at least because Zoom is incorporated in and conducts substantial business in Delaware, and Zoom has committed and continues to commit, acts of patent infringement in Delaware and in this District.

## BACKGROUND

### A.  The Asserted Patents

12.     Ricoh is a well-known multinational imaging and electronics company founded in 1936.

13.     In the 2000s, Ricoh expanded its business focus to video conferencing systems, such as cloud-based communication and collaboration services, including video conferencing, whiteboards, and messaging systems.

14.     As part of this effort, Ricoh invested significant resources and efforts in developing new and advanced video conferencing technologies.

15.     By way of example, Ricoh's groundbreaking development of a portable, cloud-based video conferencing system—the Ricoh Unified Communication System (UCS), launched in 2011—serves as a milestone in the evolution of modern video conferencing, preceding the likes of Cisco, Sony, Polycom, and Zoom. By overcoming significant technical challenges including

seamless wireless connectivity, true device portability, and an intuitive, user-friendly interface, Ricoh enabled users to connect and collaborate anytime, from virtually anywhere, whether local or remote, in the office or at home.

16.     Ricoh's pioneering approach, featuring capabilities such as effortless screen sharing, interactive whiteboard sessions, and real-time updates to participants' information and status, revolutionized how meetings were conducted and empowered users to stay connected with unprecedented ease. These achievements not only set a new benchmark for video conferencing technology, but also underscored Ricoh's enduring commitment to making communication more accessible, intuitive, and convenient for everyone.

17.     Ricoh's advances resulted in numerous patents, including U.S. Patent Nos. 10,904,487 (the "'487 Patent"); 10,909,059 (the "'059 Patent"); 10,931,917 (the "'917 Patent"); 11,256,464 (the "'464 Patent"); 11,289,093 (the "'093 Patent"); 11,516,278 (the "'278 Patent"); and 11,546,548 (the "'548 Patent") (collectively, the "Asserted Patents").

18.     The '487 Patent, titled "Integration Of Videoconferencing With Interactive Electronic Whiteboard Appliances," issued on January 26, 2021. *See* Ex. A. Steven Nelson, Lana Wong, and Hiroshi Kitada are the named inventors. The '487 Patent application (No. 16/507,952) was filed July 10, 2019 and claims priority to U.S. patent application 14/708,186, filed May 9, 2015. Ricoh is the assignee and sole owner of the '487 Patent and has the full and exclusive right to bring action and recover damages for Zoom's infringement of the '487 Patent.

19.     The '059 Patent, titled "Transmission Terminal, Non-Transitory Recording Medium, Transmission Method, And Transmission System," issued on February 2, 2021. *See* Ex. B. Yoshinaga Kato is the named inventor. The '059 Patent application (No. 16/654,752) was filed October 16, 2019 and claims priority to Japanese patent application 2014-071406, filed March 31,

2014. Ricoh is the assignee and sole owner of the '059 Patent and has the full and exclusive right to bring action and recover damages for Zoom's infringement of the '059 Patent.

20.     The '917 Patent, titled "Transmission Terminal, Transmission Method, And Computer-Readable Recording Medium Storing Transmission Program," issued on February 23, 2021. *See* Ex. C. Kenji Tanaka, Alain Volmat, Masaki Nakagawa, and Takahiro Asai are the named inventors. The '917 Patent application (No. 16/589,700) was filed October 1, 2019 and claims priority to Japanese patent application 2010-106610, filed May 6, 2010, Japanese patent application 2010-195692, filed September 1, 2010, and Japanese patent application 2011-064073, filed March 23, 2011. Ricoh is the assignee and sole owner of the '917 Patent and has the full and exclusive right to bring action and recover damages for Zoom's infringement of the '917 Patent.

21.     The '464 Patent, titled "Communication System, Communication Device, And Computer Program," issued on February 22, 2022. *See* Ex. D. Yoshinaga Kato is the named inventor. The '464 Patent application (No. 16/904,807) was filed June 18, 2020 and claims priority to Japanese patent application 2012-065917, filed March 22, 2012, and Japanese patent application 2012-251013, filed November 15, 2012. Ricoh is the assignee and sole owner of the '464 Patent and has the full and exclusive right to bring action and recover damages for Zoom's infringement of the '464 Patent.

22.     The '093 Patent, titled "Apparatus, System, And Method Of Display Control, And Recording Medium," issued on March 29, 2022. *See* Ex. E. Takuro Mano is the named inventor. The '093 Patent application (No. 16/697,190) was filed November 27, 2019 and claims priority to Japanese patent application JP2018-223360, filed November 29, 2018, and Japanese patent application JP2019-178481, filed September 30, 2019. Ricoh is the assignee and sole owner of the '093 Patent and has the full and exclusive right to bring action and recover damages for Zoom's

infringement of the '093 Patent.

23.    The '278 Patent, titled "Transmission Management System, Transmission System, And Recording Medium," issued on November 29, 2022. *See* Ex. F. Kaoru Maeda and Takahiro Asai are the named inventors. The '487 Patent application (No. 17/104,322) was filed November 25, 2020 and claims priority to Japanese patent application 2012-171192, filed August 1, 2012. Ricoh is the assignee and sole owner of the '278 Patent and has the full and exclusive right to bring action and recover damages for Zoom's infringement of the '278 Patent.

24.    The '548 Patent, titled "Transmission Management Apparatus," issued on January 3, 2023. *See* Ex. G. Yoshinaga Kato and Taro Okuyama are the named inventors. The '548 Patent application (No. 16/903,713) was filed June 17, 2020 and claims priority to Japanese patent application JP2011-042365, filed February 28, 2011, and Japanese patent application JP2011-236251, filed October 27, 2011. Ricoh is the assignee and sole owner of the '548 Patent and has the full and exclusive right to bring action and recover damages for Zoom's infringement of the '548 Patent.

25.    To the extent necessary, Ricoh has complied with the requirements of 35 U.S.C. § 287, such that Ricoh may recover pre-suit damages.

**B.  The Accused Products**

26.    Zoom offers cloud-based communication and collaboration products and services, including video conferencing, whiteboards, and messaging systems. Zoom's products and services are accessible through a variety of interfaces, including web-based portals and downloadable applications for both computers and mobile devices. These products and services enable users to conduct virtual meetings, webinars, and collaborative sessions, supporting both individual and enterprise customers across a wide range of industries.

27.     Zoom operates a platform of products, services, and/or features designed to provide a set of communication and collaboration tools. For example, Zoom currently markets a platform called "Zoom Workplace." The Zoom Workplace platform encompasses a range of integrated products and features, including but not limited to: Zoom Meetings, Zoom Team Chat, Zoom Docs, Zoom Whiteboard, Zoom Rooms, Zoom Sessions, and Zoom Webinars. The availability of certain products, services, and features in Zoom Workplace depends on a customer's selected service plan with Zoom.



https://www.zoom.com/en/products

28.     Zoom offers the Zoom Workplace application for download on its website (https://zoom.us/download) for use by customers and end users on computers and laptops. Zoom also offers the Zoom Rooms application for download to use in conference rooms and touchscreen displays. Additionally, Zoom develops and offers the Zoom Workplace application for use on mobile devices, which is available for download through the Apple App Store and the Google Play Store.

29.     Prior to 2024, Zoom's platform was known as "Zoom One." This platform offered a similar suite of features and applications as those currently available in the "Zoom Workplace" platform.

30.     Zoom's products and services infringe claims of the Asserted Patents.

31.     Zoom at least directly infringes claims of the Asserted Patents by making, using, testing, developing, selling, offering for sale, and/or importing the accused products and services, including but not limited to Zoom Meetings, Zoom Rooms, Zoom Sessions, Zoom Webinars, Zoom Whiteboard, and Zoom Cloud Recording as set forth throughout this Complaint.

32.     Furthermore, Zoom indirectly infringes claims of the Asserted Patents by offering the accused products and services, including but not limited to Zoom Meetings, Zoom Rooms, Zoom Sessions, Zoom Webinars, Zoom Whiteboard, and Zoom Cloud Recording, for download and/or use by customers, end users, and manufacturers, such as DTEN, Inc., on their own devices, including computers, laptops, and mobile devices. By making the accused products and services, including but not limited to Zoom Meetings, Zoom Rooms, Zoom Sessions, Zoom Webinars, Zoom Whiteboard, and Zoom Cloud Recording, available for download and instructing customers, end users, and manufacturers in their use, Zoom induces and/or contributes to the direct infringement of the Asserted Patents by its customers, end users, and manufacturers, as set forth throughout this Complaint.

**C. Zoom's Knowledge of Ricoh's Patents and Zoom's Infringement**

33.    On April 11, 2024, counsel for Ricoh sent a letter to Zoom and its counsel ("Notice Letter") specifically identifying the Asserted Patents by number and informing Zoom that these patents are relevant to Zoom's products, services, and software, including, but not limited to, Zoom Rooms, Zoom Meetings, Zoom Web Client, and Zoom Cloud Recording.

34.    Additionally, Zoom has been aware of Ricoh's patent portfolio and the Asserted Patents prior to the Notice Letter, as Ricoh's patents are publicly available and widely cited in the field of video conferencing and collaboration technologies.

35.    Zoom is a sophisticated technology company with regular practices for monitoring relevant patents in its industry, and it is reasonable to infer that Zoom was aware, or should have been aware, of Ricoh's patents and the Asserted Patents prior to receiving the Notice Letter.

36.    For example, certain patents issued to Zoom cite to members of Ricoh's '487 Patent family, further evidencing Zoom's knowledge of the Asserted Patents. Specifically:

- Zoom's U.S. Patent No. 11,330,026 cites Ricoh's U.S. Patent Application Publication No. 2017/0302887, a member of the '487 Patent family.

- Zoom's U.S. Patent Nos. 11,873,333 and 11,824,671 each cite Ricoh's U.S. Patent No. 9,699,411, another member of the '487 Patent family.

- Zoom's U.S. Patent No. 11,785,063 cites Ricoh's U.S. Patent Application Publication No. 2016/0330404, also a member of the '487 Patent family.

<u>**COUNT I**</u>
<u>**(CLAIM FOR PATENT INFRINGEMENT OF THE '487 PATENT)**</u>

37.    Ricoh incorporates the foregoing paragraphs by reference as if fully set forth herein.

38.    This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§271, *et seq.*

39.     A true and accurate copy of the '487 Patent is attached hereto as Exhibit A.

40.     Ricoh is the assignee of the '487 Patent, with ownership of all substantial rights in the '487 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

41.     The '487 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

42.     The claims of the '487 Patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting systems and methods.

43.     The written description of the '487 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

44.     The claims of the '487 Patent are directed to improvements of interactive whiteboard devices, non-transitory computer-readable media for interactive whiteboard devices, and computer-implemented methods for interactive whiteboard devices, and not an abstract idea.

45.     Independent claim 15 of the '487 Patent recites:

15. A computer-implemented method comprising:

an interactive whiteboard session window, including at least an interactive whiteboard session content area, to be displayed on a display of a whiteboard device, wherein a selection menu to receive an instruction for starting a video conference session is overlaid on the interactive

whiteboard session window; and

after receiving the instruction for starting the video conference session via the selection menu overlaid on the interactive whiteboard session window, a videoconference window to be overlaid on the interactive whiteboard session window.

46.     Zoom has and continues to directly and/or indirectly infringe (by inducing infringement and/or contributing to infringement) one or more claims of the '487 Patent in this District and elsewhere in Delaware and the United States.

47.     Zoom designs, makes, offers for sale, uses, and sells products and services, such as Zoom Meetings, Zoom Rooms, Zoom Sessions, Zoom Webinar, and Zoom Whiteboard (the "'487 Accused Products"), in a manner that infringes the '487 Patent.

48.     Zoom directly infringes (both literally and/or under the doctrine of equivalents) the '487 Patent under 35 U.S.C. § 271(a) by using, making, offering for sale, selling, and/or importing the '487 Accused Products, their components and processes, and/or products and services containing the same that incorporate the fundamental technologies covered by the '487 Patent.

49.     By way of non-limiting example(s), set forth below (with claim language in bold and italics) is exemplary evidence of direct infringement of claim 15 of the '487 Patent by the '487 Accused Products.

50.     ***15(a): "A computer-implemented method comprising:"***—The '487 Accused Products perform a computer-implemented method for an interactive whiteboard session. A non-limiting example is shown below:



51.    **15(b): "an interactive whiteboard session window, including at least an interactive whiteboard session content area, to be displayed on a display of a whiteboard device, wherein a selection menu to receive an instruction for starting a video conference session is overlaid on the interactive whiteboard session window; and"**—The '487 Accused Products have an interactive whiteboard session window, including at least an interactive whiteboard session content area, to be displayed on a display of a whiteboard device, where a selection menu to receive an instruction for starting a video conference session is overlaid on the interactive whiteboard session window. A non-limiting example is shown below:





52.     Selecting the "Whiteboard" icon opens an interactive whiteboard session window, which includes at least an interactive whiteboard session content area on the display. A selection menu is overlaid on the interactive whiteboard session window. This selection menu includes a "START MEETING" option, which allows the user to start a video conference session.

53.     ***15(c): "after receiving the instruction for starting the video conference session via the selection menu overlaid on the interactive whiteboard session window, a videoconference window to be overlaid on the interactive whiteboard session window."***—For the '487 Accused Products, after receiving the instruction for starting the video conference session via the selection menu overlaid on the interactive whiteboard session window, a videoconference window to be overlaid on the interactive whiteboard session window. A non-limiting example is shown below:



54.     After the user selects "START MEETING" from the overlaid selection menu, a video conference session is started. A videoconference window is then overlaid on the interactive whiteboard session window.

55.     Zoom also indirectly infringes the '487 Patent under 35 U.S.C. § 271(b) and/or U.S.C. § 271(c). Zoom, at a minimum, has known of the '487 Patent at least as early as the filing date of the Complaint. In addition, Zoom has known about the '487 Patent since at least April 11, 2024, when counsel for Ricoh sent the Notice Letter to Zoom alerting Zoom to its infringement.

56.     Since at least the above-mentioned date when Zoom was on notice of its infringement, Zoom has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '487 Accused Products that include or are made using all of the limitations of one or more claims of the '487 Patent to directly infringe one or more claims of the '487 Patent by using, offering for sale, selling, and/or importing the '487 Accused Products. Since at least the notice provided on the above-mentioned date, Zoom does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the

'487 Patent. Zoom intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the '487 Accused Products, creating and/or maintaining established distribution channels for the '487 Accused Products into and within the United States, manufacturing the '487 Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and testing the '487 Accused Products, and/or providing technical support, replacement, or services for these products to these purchasers in the United States. For example, Zoom advertises and provides technical support to its customers using the '487 Accused Products at Zoom.com and Support.Zoom.com.

57.    In addition, since at least the above-mentioned date when Zoom was on notice of its infringement, Zoom has contributorily infringed, under U.S.C. § 271(c), one or more claims of the '487 Patent. For example, Zoom contributes to the direct infringement of such claims by distributors, customers, subsidiaries, importers, and/or consumers that use, import, purchase, or sell the '487 Accused Products. The '487 Accused Products are a material part of the invention of the '487 Patent and are not a staple article of commerce suitable for substantial non-infringing use.

58.    The technology discussion above and the exemplary '487 Accused Products provide context for Ricoh's infringement allegations.

59.    Despite having knowledge of the '487 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '487 Patent, Zoom has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Zoom's infringing activities relative to the '487 Patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, and an egregious case of misconduct beyond typical

infringement such that Ricoh is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed and an award of attorney's fees under 35 U.S.C. § 285.

## COUNT 2
## (CLAIM FOR PATENT INFRINGEMENT OF THE '059 PATENT)

60.    Ricoh incorporates the foregoing paragraphs by reference as if fully set forth herein.

61.    This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§271, *et seq*.

62.    A true and accurate copy of the '059 Patent is attached hereto as Exhibit B.

63.    Ricoh is the assignee of the '059 Patent, with ownership of all substantial rights in the '487 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

64.    The '059 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

65.    The claims of the '059 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting systems and methods.

66.    The written description of the '059 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

67.    The claims of the '059 Patent are directed to improvements of transmission terminals and methods for performing video conferencing, and not an abstract idea.

68.    Independent claim 4 of the '059 Patent recites:

4. A method implemented by a transmission terminal performing a video conference with a plurality of transmission terminals, method comprising:

displaying on a screen of the transmission terminal, information concerning a total number of transmission terminals participating in the video conference, and displaying, on the screen of the transmission terminal, respective sets of image data transmitted by transmission terminals participating in the video conference to each other, wherein

a number of the sets of image data, transmitted by transmission terminals participating in the video conference to each other, to display on the screen of the transmission terminal is smaller than the total number of transmission terminals participating in the video conference.

69.     Independent claim 6 of the '059 Patent recites:

6. A method implemented by a transmission terminal performing a video conference with a plurality of transmission terminals, the method comprising:

displaying, on a screen of the transmission terminal, information concerning a total number of transmission terminals participating in the video conference, and displaying, on the screen of the transmission terminal, respective sets of image data transmitted by transmission terminals participating in the video conference to each other, wherein

the total number of transmission terminals participating in the video conference is greater than a number of the sets of image data, transmitted by transmission terminals participating in the video conference to each other, to display on the screen of the transmission

- 17 -

terminal.

70.    Zoom has and continues to directly and/or indirectly infringe (by inducing infringement and/or contributing to infringement) one or more claims of the '059 Patent in this District and elsewhere in Delaware and the United States.

71.    Zoom designs, makes, offers for sale, uses, and sells products and services, such as Zoom Meetings, Zoom Rooms, Zoom Sessions, and Zoom Webinar (the "'059 Accused Products"), in a manner that infringes the '059 Patent.

72.    Zoom directly infringes (both literally and/or under the doctrine of equivalents) the '059 Patent under 35 U.S.C. § 271(a) by using, making, offering for sale, selling, and/or importing the '059 Accused Products, their components and processes, and/or products and services containing the same that incorporate the fundamental technologies covered by the '059 Patent.

73.    By way of non-limiting example(s), set forth below (with claim language in bold and italics) is exemplary evidence of direct infringement of claims 4 and 6 of the '059 Patent by the '059 Accused Products.

74.    ***4(a): "A method implemented by a transmission terminal performing a video conference with a plurality of transmission terminals, method comprising:"***—The '059 Accused Products perform a method implemented by a transmission terminal performing a video conference with a plurality of transmission terminals. A non-limiting example is shown below:



75.    *4(b): "displaying on a screen of the transmission terminal, information concerning a total number of transmission terminals participating in the video conference, and displaying, on the screen of the transmission terminal, respective sets of image data transmitted by transmission terminals participating in the video conference to each other, wherein"*—The '059 Accused Products display on a screen of the transmission terminal, information concerning a total number of transmission terminals participating in the video conference, and display on the screen of the transmission terminal, respective sets of image data transmitted by transmission terminals participating in the video conference to each other. For example, as shown in the screenshot above, the '059 Accused Products display on a screen of the transmission terminal, information concerning a total number of participants in a video conference. The total number of participants is 52, which informs each user of the total number of transmission terminals (i.e., participant devices) currently engaged in the video conference. The '059 Accused Products further display on the screen of the transmission terminals, respective sets of image data transmitted by the transmission terminals participating in the video conference to each other.

76.    *4(c): "a number of the sets of image data, transmitted by transmission terminals*

*participating in the video conference to each other, to display on the screen of the transmission terminal is smaller than the total number of transmission terminals participating in the video conference."*—For the '059 Accused Products, a number of the sets of image data, transmitted by transmission terminals participating in the video conference to each other, to display on the screen of the transmission terminal is smaller than the total number of transmission terminals participating in the video conference. For example, as shown in the screenshot above, the '059 Accused Products allow 49 participant video feeds (e.g., the number of the sets of image data) to be displayed on the screen, which is smaller than the total number of participants (transmission terminals participating in the video conference), which is 52.

77.    *6(a): "A method implemented by a transmission terminal performing a video conference with a plurality of transmission terminals, the method comprising:"*—The '059 Accused Products perform a method implemented by a transmission terminal performing a video conference with a plurality of transmission terminals. A non-limiting example is shown below:



78.    *6(b): "displaying, on a screen of the transmission terminal, information concerning a total number of transmission terminals participating in the video conference, and displaying, on*

*the screen of the transmission terminal, respective sets of image data transmitted by transmission terminals participating in the video conference to each other, wherein"*—The '059 Accused Products display, on a screen of the transmission terminal, information concerning a total number of transmission terminals participating in the video conference, and display, on the screen of the transmission terminal, respective sets of image data transmitted by transmission terminals participating in the video conference to each other. For example, as shown in the screenshot above, the '059 Accused Products display, on a screen of the transmission terminal, information concerning a total number of participants in a video conference. The total number of participants is 52, which informs each user of the total number of transmission terminals (i.e., participant devices) currently engaged in the video conference. The '059 Accused Products further display, on the screen of the transmission terminals, respective sets of image data transmitted by the transmission terminals participating in the video conference to each other.

79.    *6(c): "the total number of transmission terminals participating in the video conference is greater than a number of the sets of image data, transmitted by transmission terminals participating in the video conference to each other, to display on the screen of the transmission terminal."*—For the '059 Accused Products, the total number of transmission terminals participating in the video conference is greater than a number of the sets of image data, transmitted by transmission terminals participating in the video conference to each other, to display on the screen of the transmission terminal. For example, as shown in the screenshot above, the total number of 52 participants (transmission terminals participating in the video conference), which is greater than 49 participant video feeds (i.e., a number of the sets of image data) to display on the screen of the transmission terminal.

80.    Zoom also indirectly infringes the '059 Patent under 35 U.S.C. § 271(b) and/or U.S.C.

§ 271(c). Zoom, at a minimum, has known of the '059 Patent at least as early as the filing date of the Complaint. In addition, Zoom has known about the '059 Patent since at least April 11, 2024, when counsel for Ricoh sent the Notice Letter to Zoom alerting Zoom to its infringement.

81.     Since at least the above-mentioned date when Zoom was on notice of its infringement, Zoom has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '059 Accused Products that include or are made using all of the limitations of one or more claims of the '059 Patent to directly infringe one or more claims of the '059 Patent by using, offering for sale, selling, and/or importing the '059 Accused Products. Since at least the notice provided on the above-mentioned date, Zoom does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '059 Patent. Zoom intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the '059 Accused Products, creating and/or maintaining established distribution channels for the '059 Accused Products into and within the United States, manufacturing the '059 Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and testing the '059 Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. For example, Zoom advertises and provides technical support to its customers using the '059 Accused Products at Zoom.com and Support.Zoom.com.

82.     In addition, since at least the above-mentioned date when Zoom was on notice of its infringement, Zoom has contributorily infringed, under U.S.C. § 271(c), one or more claims of the '059 Patent. For example, Zoom contributes to the direct infringement of such claims by distributors,

customers, subsidiaries, importers, and/or consumers that use, import, purchase, or sell the '059 Accused Products. The '059 Accused Products are a material part of the invention of the '059 Patent and are not a staple article of commerce suitable for substantial non-infringing use.

83.    The technology discussion above and the exemplary '059 Accused Products provide context for Ricoh's infringement allegations.

84.    Despite having knowledge of the '059 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '059 Patent, Zoom has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Zoom's infringing activities relative to the '059 Patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed and an award of attorney's fees under 35 U.S.C. § 285.

## COUNT 3
### (CLAIM FOR PATENT INFRINGEMENT OF THE '917 PATENT)

85.    Ricoh incorporates the foregoing paragraphs by reference as if fully set forth herein.

86.    This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§271, *et seq*.

87.    A true and accurate copy of the '917 Patent is attached hereto as Exhibit C.

88.    Ricoh is the assignee of the '917 Patent, with ownership of all substantial rights in the '917 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

89.    The '917 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

90.     The claims of the '917 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting systems and methods.

91.     The written description of the '917 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

92.     The claims of the '917 Patent are directed to improvements of transmission terminals for video communications sessions, non-transitory computer-readable media for interactive whiteboard devices, and methods for video communications sessions, and computer-implemented methods for video communications sessions, and not an abstract idea.

93.     Independent claim 8 of the '917 Patent recites:

8. A method, implemented by a first transmission terminal, comprising:

obtaining first video data captured by a camera,

logging into a management system by transmitting a login request to the management system,

establishing a communication session for transmitting the first video data to a second transmission terminal that has logged into the management system,

transmitting the first video data using the established communication session,

when an external input apparatus that has not logged into the management system is connected with the first transmission terminal during the first video data being displayed on a display screen of the second

transmission terminal, receiving, from the external input apparatus,

second video data obtained in the external input apparatus, and

in response to receiving the second video data, transmitting the first video data

and the second video data for sharing with the second transmission

terminal using the established communication session.

94.     Zoom has and continues to directly and/or indirectly infringe (by inducing infringement and/or contributing to infringement) one or more claims of the '917 Patent in this District and elsewhere in Delaware and the United States.

95.     Zoom designs, makes, offers for sale, uses, and sells products and services, such as Zoom Meetings, Zoom Rooms, Zoom Sessions, and Zoom Webinar (the "'917 Accused Products"), in a manner that infringes the '917 Patent.

96.     Zoom directly infringes (both literally and/or under the doctrine of equivalents) the '917 Patent under 35 U.S.C. § 271(a) by using, making, offering for sale, selling, and/or importing the '917 Accused Products, their components and processes, and/or products and services containing the same that incorporate the fundamental technologies covered by the '917 Patent.

97.     By way of non-limiting example(s), set forth below (with claim language in bold and italics) is exemplary evidence of direct infringement of claim 8 of the '917 Patent by the '917 Accused Products.

98.     ***8(a): "A method, implemented by a first transmission terminal, comprising:"***—The '917 Accused Products perform a method, implemented by a first transmission terminal. A non-limiting example is shown below:



99. In the example above, Zoom Rooms is implemented on DTEN D7.

100. **8(b): "obtaining first video data captured by a camera,"**—The '917 Accused Products obtain first video data captured by a camera. For example, the '917 Accused Products obtain video data captured by the HD camera of DTEN D7.

101. **8(c): "logging into a management system by transmitting a login request to the management system,"**—The '917 Accused Products log into a management system by transmitting a login request to the management system. By way of example, Zoom Rooms is pre-installed on DTEN D7 and provides video conference services. Zoom Rooms logs into a management system (e.g., Zoom's server) by transmitting a login request to Zoom's server.

102. **8(d): "establishing a communication session for transmitting the first video data to a second transmission terminal that has logged into the management system,"**—The '917 Accused Products establish a communication session for transmitting the first video data to a second transmission terminal that has logged into the management system. By way of example, Zoom Rooms

is pre-installed on DTEN D7 and provides video conference services. Zoom Rooms establishes a video conference for transmitting a video data to another transmission terminal that has logged into the management system such as Zoom's server.

103.    **8(e): "transmitting the first video data using the established communication session,"**—The '917 Accused Products transmit the first video data using the established communication session. By way of example, Zoom Rooms is pre-installed on DTEN D7 and provides video conference services. Zoom Rooms transmits video data using the established video conference to another transmission terminal.

104.    **8(f): "when an external input apparatus that has not logged into the management system is connected with the first transmission terminal during the first video data being displayed on a display screen of the second transmission terminal, receiving, from the external input apparatus, second video data obtained in the external input apparatus, and"**—For the '917 Accused Products, when an external input apparatus that has not logged into the management system is connected with the first transmission terminal during the first video data being displayed on a display screen of the second transmission terminal, they receive, from the external input apparatus, second video data obtained in the external input apparatus. A non-limiting example is shown below:



105. **8(g): "in response to receiving the second video data, transmitting the first video data and the second video data for sharing with the second transmission terminal using the established communication session."**—For the '917 Accused Products, in response to receiving the second video data, they transmit the first video data and the second video data for sharing with the second transmission terminal using the established communication session. A non-limiting example is shown below:



106.    Zoom also indirectly infringes the '917 Patent under 35 U.S.C. § 271(b) and/or U.S.C. § 271(c). Zoom, at a minimum, has known of the '917 Patent at least as early as the filing date of the Complaint. In addition, Zoom has known about the '917 Patent since at least April 11, 2024, when counsel for Ricoh sent the Notice Letter to Zoom alerting Zoom to its infringement.

107.    Since at least the above-mentioned date when Zoom was on notice of its infringement, Zoom has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '917 Accused Products that include or are made using all of the limitations of one or more claims of the '917 Patent to directly infringe one or more claims of the '917 Patent by using, offering for sale, selling, and/or importing the '917 Accused Products. Since at least the notice provided on the above-mentioned date, Zoom does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '917 Patent. Zoom intends to cause, and has taken affirmative steps to induce infringement by its

distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the '917 Accused Products, creating and/or maintaining established distribution channels for the '917 Accused Products into and within the United States, manufacturing the '917 Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and testing the '917 Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. For example, Zoom advertises and provides technical support to its customers using the '917 Accused Products at Zoom.com and Support.Zoom.com.

108.    In addition, since at least the above-mentioned date when Zoom was on notice of its infringement, Zoom has contributorily infringed, under U.S.C. § 271(c), one or more claims of the '917 Patent. For example, Zoom contributes to the direct infringement of such claims by distributors, customers, subsidiaries, importers, and/or consumers that use, import, purchase, or sell the '917 Accused Products. The '917 Accused Products are a material part of the invention of the '917 Patent and are not a staple article of commerce suitable for substantial non-infringing use.

109.    The technology discussion above and the exemplary '917 Accused Products provide context for Ricoh's infringement allegations.

110.    Despite having knowledge of the '917 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '917 Patent, Zoom has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Zoom's infringing activities relative to the '917 Patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three

times the amount found or assessed and an award of attorney's fees under 35 U.S.C. § 285.

**COUNT 4**
**(CLAIM FOR PATENT INFRINGEMENT OF THE '464 PATENT)**

111.     Ricoh incorporates the foregoing paragraphs by reference as if fully set forth herein.

112.     This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§271, *et seq*.

113.     A true and accurate copy of the '464 Patent is attached hereto as Exhibit D.

114.     Ricoh is the assignee of the '464 Patent, with ownership of all substantial rights in the '487 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

115.     The '464 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

116.     The claims of the '464 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting systems and methods.

117.     The written description of the '464 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

118.     The claims of the '464 Patent are directed to improvements of communication devices for displaying images, methods for display images, and non-transitory computer-readable media for displaying images, and not an abstract idea.

119.     Independent claim 5 of the '464 Patent recites:

5. A method implemented by a communication device connected to an image capturing apparatus, a first display, and a second display, the method comprising:

transmitting data of a first captured image captured by the image capturing apparatus via a network;

receiving data of a second captured image via the network;

receiving data of a third image that is displayed on a display device of another communication device via the network, the third image being different from the first capture image and the second captured image;

controlling the first display and the second display; and

in response to supply of the third image being finished while the first display displays the first captured image and the second captured image and the second display displays the third image, automatically controlling the first display to display the first captured image and the second captured image, and controlling the second display to display none of the first captured image, the second captured image, and the third image.

120.    Zoom has and continues to directly and/or indirectly infringe (by inducing infringement and/or contributing to infringement) one or more claims of the '464 Patent in this District and elsewhere in Delaware and the United States.

121.    Zoom designs, makes, offers for sale, uses, and sells products and services, such as Zoom Meetings, Zoom Rooms, Zoom Sessions, and Zoom Webinar (the "'464 Accused Products"), in a manner that infringes the '464 Patent.

122.    Zoom directly infringes (both literally and/or under the doctrine of equivalents) the

'487 Patent under 35 U.S.C. § 271(a) by using, making, offering for sale, selling, and/or importing the '464 Accused Products, their components and processes, and/or products and services containing the same that incorporate the fundamental technologies covered by the '464 Patent.

123.    By way of non-limiting example(s), set forth below (with claim language in bold and italics) is exemplary evidence of direct infringement of claim 5 of the '464 Patent by the '464 Accused Products.

124.    ***5(a): "A method implemented by a communication device connected to an image capturing apparatus, a first display, and a second display, the method comprising:"***—The '464 Accused Products perform a method implemented by a communication device connected to an image capturing apparatus, a first display, and a second display. A non-limiting example is shown below:



https://www.zoom.com/en/products/meeting-rooms/resources/configuration/ (accessed on July 9, 2025).

125.    The '464 Accused Products are provided on a communication device such as DTEN D7 (e.g., D7 55" or D7 Dual 75") and/or Zoom users' device that is connected to an image capturing apparatus, a first display, and a second display. DTEN D7 is a video conferencing and collaboration

solution, specifically designed for use with Zoom Rooms, and DTEN D7 has a touchscreen, integrated PC, microphone, speaker, HD camera, and Zoom Rooms for Touch pre-installed.

https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0063196 (accessed on July 9, 2025).

126.    *5(b): "transmitting data of a first captured image captured by the image capturing apparatus via a network;"*—The '464 Accused Products transmit data of a first captured image captured by the image capturing apparatus via a network. As shown in the above example, DTEN D7 is a video conferencing and collaboration solution equipped with a touchscreen, integrated PC, HD camera and network inface for communicating with another communication device via a network. DTEN D7 has an integrated HD camera to capture image. The '464 Accused Products transmit data of a first captured image by the integrated HD camera via the network to another communication device.

127.    *5(c): "receiving data of a second captured image via the network;"*—The '464 Accused Products receive data of a second captured image via the network. As shown in the above example, DTEN D7 is an all-in-one video conferencing and collaboration solution equipped with a touchscreen, integrated PC, HD camera and network inface for communicating with another communication device via a network. The '464 Accused Products receive data of a second captured image from another communication device via the network in a video conference.

128.    *5(d): "receiving data of a third image that is displayed on a display device of another communication device via the network, the third image being different from the first capture image and the second captured image;"*—The '464 Accused Products receive data of a third image that is displayed on a display of another communication device via the network, and the third image is different than the first captured image and the second captured image. As a non-limiting example, the

'464 Accused Products receive data of a shared image (e.g., a share screen(s), a shared document(s), etc.) from another communication device via the network. The shared image is different than a first captured image from the communication device and the second captured image from another communication device.

129.    *5(e): "controlling the first display and the second display; and"*—The '464 Accused Products control the first display and the second display. By way of example, the '464 Accused Products control the first display and the second display within a single display device, where the first display and the second display are portions of the display area of the touchscreen of DTEN D7. By way of another example, when DTEN D7 has two touchscreens or is connected to another display device via its output interface (e.g., HDMI output), the '464 Accused Products control the first and second displays across two separate display devices (e.g., the two touchscreens of DTEN D7 Dual 75" or the touchscreen of DTEN D7 55" and another display device).

130.    *5(f): "in response to supply of the third image being finished while the first display displays the first captured image and the second captured image and the second display displays the third image, automatically controlling the first display to display the first captured image and the second captured image, and controlling the second display to display none of the first captured image, the second captured image, and the third image."*—The '464 Accused Products in response to supply of the third image being finished while the first display displays the first captured image and the second captured image and the second display displays the third image, automatically control the first display to display the first captured image and the second captured image and control the second display to display none of the first captured image, the second captured image, and the third image. By way of example, the '464 Accused Products automatically control the first display, which is one or more portions of a display area of a single display device, to display the first captured image

(e.g., a live image of a participant using the communication device) and the second captured image (e.g., a live image of another participant using another communication device). When supply of a shared image is finished, it controls the second display, which is one or more portions of the display area of the single display device to display none of the first captured image, the second captured image, and the shared image. By way of another example, when the DTEN D7 is connected to another display device via its output interface (e.g., HDMI output), the '464 Accused Products automatically control the first display, which is the touch screen of the DTEN D7, to display the first captured image (e.g., a live image of a participant using the communication device) and the second captured image (e.g., a live image of another participant using another communication device). When supply of a shared image is finished, the '464 Accused Products control the second display, which is the connected another display device to display none of the first captured image, the second captured image, and the shared image.

131.    Zoom also indirectly infringes the '464 Patent under 35 U.S.C. § 271(b) and/or U.S.C. § 271(c). Zoom, at a minimum, has known of the '464 Patent at least as early as the filing date of the Complaint. In addition, Zoom has known about the '464 Patent since at least April 11, 2024, when counsel for Ricoh sent the Notice Letter to Zoom alerting Zoom to its infringement.

132.    Since at least the above-mentioned date when Zoom was on notice of its infringement, Zoom has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '464 Accused Products that include or are made using all of the limitations of one or more claims of the '464 Patent to directly infringe one or more claims of the '464 Patent by using, offering for sale, selling, and/or importing the '464 Accused Products. Since at least the notice provided on the above-mentioned date, Zoom does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the

'464 Patent. Zoom intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the '464 Accused Products, creating and/or maintaining established distribution channels for the '464 Accused Products into and within the United States, manufacturing the '464 Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and testing the '464 Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. For example, Zoom advertises and provides technical support to its customers using the '464 Accused Products at Zoom.com and Support.Zoom.com.

133.    In addition, since at least the above-mentioned date when Zoom was on notice of its infringement, Zoom has contributorily infringed, under U.S.C. § 271(c), one or more claims of the '464 Patent. For example, Zoom contributes to the direct infringement of such claims by distributors, customers, subsidiaries, importers, and/or consumers that use, import, purchase, or sell the '464 Accused Products. The '464 Accused Products are a material part of the invention of the '464 Patent and are not a staple article of commerce suitable for substantial non-infringing use.

134.    The technology discussion above and the exemplary '464 Accused Products provide context for Ricoh's infringement allegations.

135.    Despite having knowledge of the '464 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '464 Patent, Zoom has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Zoom's infringing activities relative to the '464 Patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, and an egregious case of misconduct beyond typical

infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed and an award of attorney's fees under 35 U.S.C. § 285.

### COUNT 5
### (CLAIM FOR PATENT INFRINGEMENT OF THE '093 PATENT)

136.    Ricoh incorporates the foregoing paragraphs by reference as if fully set forth herein.

137.    This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§271, *et seq.*

138.    A true and accurate copy of the '093 Patent is attached hereto as Exhibit E.

139.    Ricoh is the assignee of the '093 Patent, with ownership of all substantial rights in the '093 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

140.    The '093 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

141.    The claims of the '093 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting systems and methods.

142.    The written description of the '093 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

143.    The claims of the '093 Patent are directed to improvements of display control apparatus and systems, display control methods, and non-transitory computer-readable media for display control, and not an abstract idea.

144.     Independent claim 17 of the '093 Patent recites:

17. A display control method, comprising:

receiving text data converted from voice data, and time information from a server that manages content data generated during an event;

displaying, on a display, the text data in an order according to the time information;

displaying, on the display at a first display region, a graphical control region that sets playback position in a total playback time of the voice data;

receiving selection of first text data from the text data being displayed;

determining, by referring to the time information, a second display location which is different from the first display location, the second display location corresponding to the time information of the first text data; and

controlling the display to display the graphical control region at the second display location.

145.     Zoom has and continues to directly and/or indirectly infringe (by inducing infringement and/or contributing to infringement) one or more claims of the '093 Patent in this District and elsewhere in Delaware and the United States.

146.     Zoom designs, makes, offers for sale, uses, and sells products and services, such as Zoom Meetings, Zoom Rooms, Zoom Cloud Recording, Zoom Sessions, and Zoom Webinars (the "'093 Accused Products"), in a manner that infringes the '093 Patent.

147.     Zoom directly infringes (both literally and/or under the doctrine of equivalents) the '093 Patent under 35 U.S.C. § 271(a) by using, making, offering for sale, selling, and/or importing

the '093 Accused Products, their components and processes, and/or products and services containing the same that incorporate the fundamental technologies covered by the '093 Patent.

148.    By way of non-limiting example(s), set forth below (with claim language in bold and italics) is exemplary evidence of direct infringement of claim 17 of the '093 Patent by the '093 Accused Products.

149.    ***17(a): "A display control method, comprising:"***—The '093 Accused Products practice a display control method. A non-limiting example is shown below:



150.    ***17(b): "receiving text data converted from voice data, and time information from a server that manages content data generated during an event;"***—The '093 Accused Products receive text data converted from voice data, and time information from a server that manages content data generated during an event. A non-limiting example is shown below:



Transcribed text with time information is displayed synchronously next to the video.

151.    ***17(c): "displaying, on a display, the text data in an order according to the time information;"***—The '093 Accused Products display, on a display, the text data in an order according to the time information. As shown in the example above, the text data is displayed on a display in an order according to the time information.

152.    ***17(d): "displaying, on the display at a first display region, a graphical control region that sets playback position in a total playback time of the voice data;"***—The '093 Accused Products display, on the display at a first display region, a graphical control region that sets playback position in a total playback time of the voice data. A non-limiting example is shown below:



Transcribed text with time information is displayed synchronously next to the video.



A seek bar (a graphical control region) is displayed at bottom of video playback area. The video, seek bar and text are synchronized. The color of the seek bar indicates a playback position in a total playback time of the voice data.

153.    **17(e): "receiving selection of first text data from the text data being displayed;"**— The '093 Accused Products receive selection of first text data from the text data being displayed. A non-limiting example is shown below:



When selection of a text block is received from a text display area (e.g., right window), the seek bar is changed to the time position corresponding to the time information in the selected text block.

154.    **17(f): "determining, by referring to the time information, a second display location which is different from the first display location, the second display location corresponding to the time information of the first text data; and"**—The '093 Accused Products determine, by referring to the time information, a second display location which is different from the first display location, the second display location corresponding to the time information of the first text data. A non-limiting example is shown below:



*When selection of a text block is received from a text display area (e.g., right window), the seek bar is changed to the time position corresponding to the time information in the selected text block.*

155.    ***17(g): "controlling the display to display the graphical control region at the second display location."***—The '093 Accused Products control the display to display the graphical control region at the second display location. A non-limiting example is shown below:



*When selection of a text block is received from a text display area (e.g., right window), the seek bar is changed to the time position corresponding to the time information in the selected text block.*

156.    Zoom also indirectly infringes the '093 Patent under 35 U.S.C. § 271(b) and/or U.S.C.

§ 271(c). Zoom, at a minimum, has known of the '093 Patent at least as early as the filing date of the Complaint. In addition, Zoom has known about the '093 Patent since at least April 11, 2024, when counsel for Ricoh sent the Notice Letter to Zoom alerting Zoom to its infringement.

157.    Since at least the above-mentioned date when Zoom was on notice of its infringement, Zoom has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '093 Accused Products that include or are made using all of the limitations of one or more claims of the '093 Patent to directly infringe one or more claims of the '093 Patent by using, offering for sale, selling, and/or importing the '093 Accused Products. Since at least the notice provided on the above-mentioned date, Zoom does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '093 Patent. Zoom intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the '093 Accused Products, creating and/or maintaining established distribution channels for the '093 Accused Products into and within the United States, manufacturing the '093 Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and testing the '093 Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. For example, Zoom advertises and provides technical support to its customers using the '093 Accused Products at Zoom.com and Support.Zoom.com.

158.    In addition, since at least the above-mentioned date when Zoom was on notice of its infringement, Zoom has contributorily infringed, under U.S.C. § 271(c), one or more claims of the '093 Patent. For example, Zoom contributes to the direct infringement of such claims by distributors,

customers, subsidiaries, importers, and/or consumers that use, import, purchase, or sell the '093 Accused Products. The '093 Accused Products are a material part of the invention of the '093 Patent and are not a staple article of commerce suitable for substantial non-infringing use.

159.    The technology discussion above and the exemplary '093 Accused Products provide context for Ricoh's infringement allegations.

160.    Despite having knowledge of the '093 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '093 Patent, Zoom has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Zoom's infringing activities relative to the '093 Patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed and an award of attorney's fees under 35 U.S.C. § 285.

**COUNT 6**
**(CLAIM FOR PATENT INFRINGEMENT OF THE '278 PATENT)**

161.    Ricoh incorporates the foregoing paragraphs by reference as if fully set forth herein.

162.    This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§271, *et seq*.

163.    A true and accurate copy of the '278 Patent is attached hereto as Exhibit F.

164.    Ricoh is the assignee of the '278 Patent, with ownership of all substantial rights in the '278 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

165.    The '278 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

166.    Ricoh or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '278 patent.

167.    The claims of the '278 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting systems and methods.

168.    The written description of the '278 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

169.    The claims of the '278 Patent are directed to improvements of systems and methods for modifying user information associated with transmission terminals, and not an abstract idea.

170.    Independent claim 16 of the '278 Patent recites:

16. A method, comprising:

reading, from one or more memories, first name information which indicates a name associated with identification information to be used upon logging in to a management system;

transmitting the read first name information to a transmission terminal that has logged in to a management system based on the identification information;

receiving, from the transmission terminal, second name information which is different from the first name information, is updated name information of the first name information, and is a name displayed in a meeting held based on meeting information relating to a scheduled meeting,

the meeting information being stored in the one or more memories; and

storing, in the one or more memories, the second name information in association with the meeting information.

171.    Zoom has and continues to directly and/or indirectly infringe (by inducing infringement and/or contributing to infringement) one or more claims of the '278 Patent in this District and elsewhere in Delaware and the United States.

172.    Zoom designs, makes offers for sale, uses, and sells products and services, such as Zoom Meetings, Zoom Rooms, Zoom Sessions, and Zoom Webinar (the "'278 Accused Products"), in a manner that infringes the '278 Patent.

173.    Zoom directly infringes (both literally and/or under the doctrine of equivalents) the '278 Patent under 35 U.S.C. § 271(a) by using, making, offering for sale, selling, and/or importing the '278 Accused Products, their components and processes, and/or products and services containing the same that incorporate the fundamental technologies covered by the '278 Patent.

174.    By way of non-limiting example(s), set forth below (with claim language in bold and italics) is exemplary evidence of direct infringement of claim 16 of the '278 Patent by the '278 Accused Products.

175.    ***16(a): "A method, comprising:"***—The '278 Accused Products practice a method. A non-limiting example is shown below:



https://explore.zoom.us/docs/doc/Zoom%20Connection%20Process%20Whitepaper.pdf

176.    The '278 Accused Products include a management system to perform the method of conducting a Zoom meeting and updating a participant's name.

177.    **16(b): "reading, from one or more memories, first name information which indicates a name associated with identification information to be used upon logging in to a management system;"**—The '278 Accused Products read, from one or more memories, first name information which indicates a name associated with identification information to be used upon logging in to a management system. A non-limiting example is shown below:

Zoom reads and manages, for each user, a login account (identification information) and a name (first name information) in association with each other.



178.    *16(c): "transmitting the read first name information to a transmission terminal that has logged in to a management system based on the identification information;"*—The '278 Accused Products transmit the read first name information to a transmission terminal that has logged in to a management system based on the identification information. A non-limiting example is shown below:



179.   ***16(d): "receiving, from the transmission terminal, second name information which is different from the first name information, is updated name information of the first name information, and is a name displayed in a meeting held based on meeting information relating to a scheduled meeting, the meeting information being stored in the one or more memories; and"***—
The '278 Accused Products receive, from the transmission terminal, second name information which is different from the first name information, is updated name information of the first name information, and is a name displayed in a meeting held based on the meeting information relating to a scheduled meeting, where the meeting information being stored in the one or more memories. A non-limiting example is shown below:



180. In the non-limiting example above, a user named "Zoomie 2" can change his/her name to "Zoomie!" Also, a user named "Zoomie" can change his/her name.

181. ***16(e): "storing, in the one or more memories, the second name information in association with the meeting information."***—The '278 Accused Products store, in the one or more memories, the second name information in association with the meeting information. A non-limiting example is shown below:

**Zoom Meeting API** that returns a list of participants in response to a request sent with a Meeting ID

Specific Example



The information (user ID, display name) of all participants is stored in Zoom's management system in association with meeting information (Meeting ID)

182.    Zoom also indirectly infringes the '278 Patent under 35 U.S.C. § 271(b) and/or U.S.C. § 271(c). Zoom, at a minimum, has known of the '278 Patent at least as early as the filing date of the Complaint. In addition, Zoom has known about the '278 Patent since at least April 11, 2024, when counsel for Ricoh sent the Notice Letter to Zoom alerting Zoom to its infringement.

183.    Since at least the above-mentioned date when Zoom was on notice of its infringement, Zoom has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '278 Accused Products that include or are made using all of the limitations of one or more claims of the '278 Patent to directly infringe one or more claims of the '278 Patent by using, offering for sale, selling, and/or importing the '278 Accused Products. Since at least the notice provided on the above-mentioned date, Zoom does so with

knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the
'278 Patent. Zoom intends to cause, and has taken affirmative steps to induce infringement by its
distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating
advertisements that promote the infringing use of the '278 Accused Products, creating and/or
maintaining established distribution channels for the '278 Accused Products into and within the
United States, manufacturing the '278 Accused Products in conformity with U.S. laws and
regulations, distributing or making available instructions or manuals for these products to purchasers
and prospective buyers, and testing the '278 Accused Products, and/or providing technical support,
replacement parts, or services for these products to these purchasers in the United States. For example,
Zoom advertises and provides technical support to its customers using the '278 Accused Products at
Zoom.com and Support.Zoom.com.

184.    In addition, since at least the above-mentioned date when Zoom was on notice of its
infringement, Zoom has contributorily infringed, under U.S.C. § 271(c), one or more claims of the
'278 Patent. For example, Zoom contributes to the direct infringement of such claims by distributors,
customers, subsidiaries, importers, and/or consumers that use, import, purchase, or sell the '278
Accused Products. The '278 Accused Products are a material part of the invention of the '278 Patent
and are not a staple article of commerce suitable for substantial non-infringing use.

185.    The technology discussion above and the exemplary '278 Accused Products provide
context for Ricoh's infringement allegations.

186.    Despite having knowledge of the '278 Patent and knowledge that it is directly and/or
indirectly infringing one or more claims of the '278 Patent, Zoom has nevertheless continued its
infringing conduct and disregarded an objectively high likelihood of infringement. Zoom's infringing
activities relative to the '278 Patent have been, and continue to be, willful, wanton, malicious, in bad-

faith, deliberate, consciously wrongful, flagrant, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed and an award of attorney's fees under 35 U.S.C. § 285.

### COUNT 7
### (CLAIM FOR PATENT INFRINGEMENT OF THE '548 PATENT)

187.    Ricoh incorporates the foregoing paragraphs by reference as if fully set forth herein.

188.    This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§271, *et seq.*

189.    A true and accurate copy of the '548 Patent is attached hereto as Exhibit G.

190.    Ricoh is the assignee of the '548 Patent, with ownership of all substantial rights in the '548 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

191.    The '548 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

192.    The claims of the '548 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting systems and methods.

193.    The written description of the '548 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

194.    The claims of the '548 Patent are directed to improvements of transmission management apparatus and systems, methods, and non-transitory computer-readable media for

updating the attendance state in video communications, and not an abstract idea.

195.    Independent claim 9 of the '548 Patent recites:

9. A method comprising:

updating attendance states of a plurality of transmission terminals including a first transmission terminal and a second transmission terminal;

storing, in a storage medium, first information including a first identification name and a first attendance state associated with the first transmission terminal, and second information including a second identification name and a second attendance state associated with the second transmission terminal;

updating the first attendance state associated with the first transmission terminal to a state indicating that the first transmission terminal is attending a video communication, based on attendance request information for video communication received from the first transmission terminal;

updating when the second transmission terminal attends the video communication, the second attendance state associate with the second transmission terminal to a state indicating that the second transmission terminal is attending the video communication;

acquiring information including an identification name associated with a transmission terminal with which an attendance state is associated and in which the attendance state indicates that the transmission terminal is attending the video communication, from the storage medium;

transmitting the acquired information to the first transmission terminal,
wherein the acquired information is used in order to display an
identification name list of sites including the first transmission
terminal and the second transmission terminal which are attending the
video communication during the video communication; and

displaying, by the first transmission terminal, video images from each
transmission terminal attending the video communication
simultaneously.

196.    Zoom has and continues to directly and/or indirectly infringe (by inducing
infringement and/or contributing to infringement) one or more claims of the '548 Patent in this District
and elsewhere in Delaware and the United States.

197.    Zoom designs, makes, offers for sale, uses, and sells products and services, such as
Zoom Meetings, Zoom Rooms, Zoom Sessions, and Zoom Webinar (the "'548 Accused Products"),
in a manner that infringes the '548 Patent.

198.    Zoom directly infringes (both literally and/or under the doctrine of equivalents) the
'548 Patent under 35 U.S.C. § 271(a) by using, making, offering for sale, selling, and/or importing
the '548 Accused Products, their components and processes, and/or products and services containing
the same that incorporate the fundamental technologies covered by the '548 Patent.

199.    By way of non-limiting example(s), set forth below (with claim language in bold and
italics) is exemplary evidence of direct infringement of claim 9 of the '548 Patent by the '548 Accused
Products.

200.    *9(a): "A method comprising:"*—The '548 Accused Products practice a method. A
non-limiting example is shown below:



https://explore.zoom.us/docs/doc/Zoom%20Connection%20Process%20Whitepaper.pdf

201.    **9(b): "updating attendance states of a plurality of transmission terminals including a first transmission terminal and a second transmission terminal;"**—The '548 Accused Products update attendance states of a plurality of transmission terminals including a first transmission terminal and a second transmission terminal. A non-limiting example is shown below:

| | | |
|---|---|---|
| 🎥 | In a Zoom meeting | Contact has started or joined a Zoom Meeting using the Zoom desktop client or mobile app. |
| 🎥 | Presenting | Contact is sharing their screen while in a Zoom Meeting. |

202.    **9(c): "storing, in a storage medium, first information including a first identification name and a first attendance state associated with the first transmission terminal, and second information including a second identification name and a second attendance state associated with the second transmission terminal;"**—The '548 Accused Products store, in a storage medium, first information including a first identification name and a first attendance state associated with the first transmission terminal, and second information including a second identification name and a second attendance state associated with the second transmission terminal. A non-limiting example is shown

below:



203.    ***9(d): "updating the first attendance state associated with the first transmission terminal to a state indicating that the first transmission terminal is attending a video communication, based on attendance request information for video communication received from the first transmission terminal;"***—The '548 Accused Products update the first attendance state associated with the first transmission terminal to a state indicating that the first transmission terminal is attending a video communication, based on attendance request information for video communication received from the first transmission terminal. A non-limiting example is shown below:



204.    In response to an attendance request being received from the first transmission terminal, the first attendance state associated with the first transmission terminal is updated to the presence indicating the first transmission terminal is attending a Zoom meeting.

205.    ***9(e): "updating when the second transmission terminal attends the video communication, the second attendance state associate with the second transmission terminal to a state indicating that the second transmission terminal is attending the video communication;"***— The '548 Accused Products update, when the second transmission terminal attends the video communication, the second attendance state associated with the second transmission terminal to a

state indicating that the second transmission terminal is attending the video communication. By way of example, in response to an attendance request being received from the second transmission terminal, the second attendance state associated with the second transmission terminal is updated to the presence indicating the second transmission terminal is attending the Zoom meeting.

206.     ***9(f): "acquiring information including an identification name associated with a transmission terminal with which an attendance state is associated and in which the attendance state indicates that the transmission terminal is attending the video communication, from the storage medium;"***—The '548 Accused Products acquire information including an identification name associated with a transmission terminal with which an attendance state is associated and in which the attendance state indicates that the transmission terminal is attending the video communication, from the storage medium. By way of example, the information including an identification name (e.g., display name of participant(s)) associated with a transmission terminal with which an attendance state (e.g., in a Zoom meeting or presenting) is associated and in which the attendance state indicates that the transmission terminal is attending the video communication is acquired from the storage medium (e.g., storage of Zoom's servers).

| | | |
|---|---|---|
| 📹 | In a Zoom meeting | Contact has started or joined a Zoom Meeting using the Zoom desktop client or mobile app. |
| 📹 | Presenting | Contact is sharing their screen while in a Zoom Meeting. |

207.     ***9(g): "transmitting the acquired information to the first transmission terminal, wherein the acquired information is used in order to display an identification name list of sites including the first transmission terminal and the second transmission terminal which are attending the video communication during the video communication; and"***— The '548 Accused Products transmit the acquired information to the first transmission terminal, where the acquired information is used in order to display an identification name list of sites including the first transmission terminal

and the second transmission terminal which are attending the video communication during the video communication. A non-limiting example is shown below:



208.    ***9(h): "displaying, by the first transmission terminal, video images from each transmission terminal attending the video communication simultaneously."***—The '548 Accused Products display, by the first transmission terminal, video images from each transmission terminal attending the video communication simultaneously. A non-limiting example is shown below:



https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0066807

209.    Zoom also indirectly infringes the '548 Patent under 35 U.S.C. § 271(b) and/or U.S.C. § 271(c). Zoom, at a minimum, has known of the '548 Patent at least as early as the filing date of the Complaint. In addition, Zoom has known about the '548 Patent since at least April 11, 2024, when counsel for Ricoh sent the Notice Letter to Zoom alerting Zoom to its infringement.

210.    Since at least the above-mentioned date when Zoom was on notice of its infringement, Zoom has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '548 Accused Products that include or are made using all of the limitations of one or more claims of the '548 Patent to directly infringe one or more claims of the '548 Patent by using, offering for sale, selling, and/or importing the '548 Accused Products. Since at least the notice provided on the above-mentioned date, Zoom does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '548 Patent. Zoom intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the '548 Accused Products, creating and/or maintaining established distribution channels for the '548 Accused Products into and within the United States, manufacturing the '548 Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and testing the '548 Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. For example, Zoom advertises and provides technical support to its customers using the '548 Accused Products at Zoom.com and Support.Zoom.com.

211.    In addition, since at least the above-mentioned date when Zoom was on notice of its

infringement, Zoom has contributorily infringed, under U.S.C. § 271(c), one or more claims of the '548 Patent. For example, Zoom contributes to the direct infringement of such claims by distributors, customers, subsidiaries, importers, and/or consumers that use, import, purchase, or sell the '548 Accused Products. The '548 Accused Products are a material part of the invention of the '548 Patent and are not a staple article of commerce suitable for substantial non-infringing use.

212.    The technology discussion above and the exemplary '548 Accused Products provide context for Ricoh's infringement allegations.

213.    Despite having knowledge of the '548 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '548 Patent, Zoom has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Zoom's infringing activities relative to the '548 Patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed and an award of attorney's fees under 35 U.S.C. § 285.

## JURY DEMAND

214.    Ricoh demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Ricoh prays for the following relief:

      a.   Adjudge that Zoom has infringed and is infringing the Asserted Patents;

      b.   Award Ricoh damages in an amount adequate to compensate Ricoh for Zoom's infringement of the Asserted Patents, but in no event less than a reasonable royalty under 35 U.S.C. § 284;

      c.   Order that Zoom and its affiliates, employees, agents, officers, directors, attorneys,

successors, and assigns and all those acting on behalf of or in concert with Zoom be permanently enjoined from infringement, inducement of infringement, and contributory infringement of each of the Asserted Patents;

d.  Order an accounting of all damages;

e.  Adjudge that Zoom's infringement of the Asserted Patents has been willful, and that the Court award treble damages for the period of such willful infringement pursuant to 35 U.S.C. § 284;

f.  Award enhanced damages pursuant to 35 U.S.C. § 284;

g.  Award pre-judgment and post-judgment interest on the damages awarded at the highest rate allowed by law;

h.  Enter an order finding that this is an exceptional case and awarding Ricoh its costs, attorney's fees, and expenses, whether under 35 U.S.C. § 285 or otherwise;

i.  Grant Ricoh such other and further relief, general and special, at law or in equity, as the Court deems just and equitable.

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

_____
Andrew C. Mayo (#5207)
Brian A. Biggs (#5591)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
amayo@ashbygeddes.com
bbiggs@ashbygeddes.com

*Of Counsel:*

Brett C. Govett
Norton Rose Fulbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX 75201-7932
(214) 855-8000
brett.govett@nortonrosefulbright.com

Michael V. Solomita
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10019-6022
(212) 408-5420
michael.solomita@nortonrosefulbright.com

Dated: August 29, 2025

*Attorneys for Plaintiff*
*Ricoh Company, Ltd.*